## JUDGE CASTEL

**KILPATRICK STOCKTON LLP**
Lisa Pearson (LP 4916)
Christopher Lick (CL 1391)
Robert Potter (RP 5757)
31 West 52nd Street, 14th Floor
New York, NY 10019
Telephone: (212) 775-8700
Facsimile: (212) 775-8800

*Attorney for Plaintiff Zino Davidoff SA*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**



| | |
|---|---|
| ZINO DAVIDOFF SA, | |
| Plaintiff, | 08 Civ. |
| v. | |
| AMERICAN RESOURCES CORP., | **COMPLAINT** |
| Defendant. | |

Plaintiff Zino Davidoff SA ("Zino Davidoff"), by its attorneys Kilpatrick Stockton LLP, for its complaint alleges as follows:

### SUBSTANCE OF THE ACTION

1.      Zino Davidoff has created a highly successful line of prestige fragrances and related products under its famous DAVIDOFF house mark.  For example, Zino Davidoff's DAVIDOFF COOL WATER men's and women's fragrances consistently rank among the top-selling fragrances in the U.S.  American Resources Corp. ("ARC" or "Defendant") has violated Zino Davidoff's trademark rights in at least two distinct ways.  First, Defendant sells blatant counterfeits of Zino Davidoff's DAVIDOFF eau de toilette fragrances (the "Counterfeit DAVIDOFF Fragrances").  The Counterfeit DAVIDOFF Fragrances sold by Defendant bear the famous and federally registered DAVIDOFF mark and secondary marks, such as COOL

WATER, and copy Zino Davidoff's trade dress with such precision that they virtually guarantee consumer confusion while also tarnishing and diluting Zino Davidoff's famous marks.  Second, Defendant sells so-called "decoded" DAVIDOFF fragrances (the "Decoded DAVIDOFF Fragrances").  Decoded DAVIDOFF Fragrances are materially different from Plaintiff's authorized goods, and beyond the reach of Plaintiff's product integrity and quality controls, because the unique code that Plaintiff uses as a quality assurance, anti-counterfeiting and anti-theft measure (the "Production Code") has been removed from these unauthorized products.

2.    Defendant's sale of Counterfeit DAVIDOFF Fragrances and Decoded DAVIDOFF Fragrances is a deliberate effort to trade on Zino Davidoff's fame and goodwill and damage the valuable trademark rights that Zino Davidoff has spent decades developing and protecting.  Defendant's actions are causing irreparable harm by creating consumer confusion and by tarnishing and diluting Zino Davidoff's famous trademarks.  Zino Davidoff brings claims for trademark infringement under § 32(1) of the Federal Trademark (Lanham) Act, 15 U.S.C. § 1114(1); unfair competition and false designation of origin under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); dilution and tarnishment of Zino Davidoff's famous marks under § 43(c) of the Lanham Act, 15 U.S.C. § 1125(c); dilution under the laws of several states, including New York, N.Y. GEN. BUS. Law § 360-l (McKinney 2008), New Jersey, N.J. STAT. ANN. 56:3-13.20 (West 2003) and Connecticut, CONN. GEN. STAT. ANN § 35-11i(c) (West 2003); infringement under the law of New York, N.Y. ARTS & CULT. AFF. Law § 33.09; unfair and deceptive trade practices under the laws of several states, including New York, N.Y. GEN. BUS. Law § 349 (McKinney 2008) and New Jersey, N.J. STAT. ANN. 56:3- 13.20 (West 2003); and unfair competition under common law.  Zino Davidoff seeks permanent injunctive relief, an accounting, treble damages or statutory damages of up to $1,000,000 per counterfeit mark per

type of goods sold or distributed by Defendant as authorized by Section 35(c) of the Lanham Act, 15 U.S.C. § 1117(c), compensatory damages, recovery of its costs and attorneys' fees and other relief authorized by the Lanham Act and applicable state law.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction under Section 39 of the Trademark Act of 1946 (the "Lanham Act"), 15 U.S.C. § 1121, under Sections 1331, 1338(a), 1338(b) and 1367 of the Judicial Code, 28 U.S.C. §§ 1331, 1338(a), 1338(b), 1367, and under principles of pendent jurisdiction.  This Court also has jurisdiction pursuant to 28 U.S.C. § 1332 as there is diversity between the parties and the matter in controversy exceeds, exclusive of interest and costs, the sum of seventy-five thousand dollars.

4.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c).

## PARTIES

5.      Plaintiff Zino Davidoff SA is a joint stock company organized and existing under the laws of Switzerland with a principal place of business at Rue Faucigny 5, 1700 Fribourg, Switzerland.  Zino Davidoff is the owner of all trademark rights in DAVIDOFF and COOL WATER for fragrances (among other fragrance brands) in the U.S.  Zino Davidoff also owns all trade dress rights in DAVIDOFF fragrance products.

6.      Upon information and belief, Defendant American Resources Corp. is a corporation organized and existing under the laws of Connecticut, with its place of business located at 85 Rachel Drive, Stratford, Connecticut 06615.  Upon information and belief, ARC sells fragrances and other products to retailers or other distributors, and transacts business in this District and throughout the United States.  Upon information and belief, ARC has direct

US2000 10617302.6

involvement, participation and a financial interest in, as well as supervision over, the unlawful acts complained of herein.

## FACTS SUPPORTING ZINO DAVIDOFF'S REQUESTED RELIEF

DAVIDOFF Fragrances

7.      The DAVIDOFF brand was created by Zino Davidoff in 1911 in Geneva, Switzerland, and is today one of the world's most well known and highly respected brands for luxury products, including a line of fine fragrances.  The DAVIDOFF mark has been extensively used in U.S. commerce for many years.  Zino Davidoff's DAVIDOFF fragrance products are renowned for their high quality.

8.      Zino Davidoff's DAVIDOFF fragrance products have been distributed in interstate commerce throughout the United States, including in this judicial district, for many years.  For example, Zino Davidoff launched DAVIDOFF COOL WATER eau de toilette for men in the U.S. in 1991 and its women's DAVIDOFF COOL WATER fragrance in the U.S. in 1997.

9.      Zino Davidoff's fragrance products are identified and distinguished by the use of both the DAVIDOFF mark and a secondary mark, such as COOL WATER, RELAX or SILVER SHADOW, as well as distinctive trade dress (collectively, the "DAVIDOFF Marks").  For example, the distinctive packaging of Zino Davidoff's DAVIDOFF COOL WATER men's fragrance consists of a shiny aqua blue box containing a rectangular, aqua blue bottle imprinted with the DAVIDOFF mark in either flowing script (old logo) or block lettering (new logo) and the name of the fragrance in flowing script, as shown in Exhibit A.  Zino Davidoff's DAVIDOFF COOL WATER women's fragrance features a variation on this trade dress with a lighter aqua color and a teardrop-shaped bottle, as shown in Exhibit B.

-4-

10.     Because of Zino Davidoff's exclusive and extensive use of the DAVIDOFF Marks, the marks have acquired enormous value, certain of the Marks have become famous among the consuming public and trade, and all are recognized as identifying and distinguishing Zino Davidoff exclusively and uniquely as the source of products sold under the marks.

11.     Zino Davidoff owns numerous U.S. trademark registrations for its marks for, *inter alia*, perfume and eau de toilette, including Reg. No. 1,439,621 for DAVIDOFF and Design, Reg No. 1,453,815 for ZINO DAVIDOFF, Reg. No. 1,735,958 for DAVIDOFF COOL WATER and Design, Reg. No. 1,735,965 for COOL WATER, Reg. No. 1,744,198 for DAVIDOFF RELAX and Design, Reg. No. 1,753,520 for DAVIDOFF RELAX and Design, Reg. No. 2,609,218 for DAVIDOFF, Reg. No. 2,723,215 for DAVIDOFF COOL WATER in Design for bottle shape, Reg. No. 2,950,263 for DAVIDOFF COOL WATER DEEP, Reg. No. 3,174,289 for SILVER SHADOW, Reg. No. 3,184,046 for GAME, Reg. No. 3,242,675 for SILVER SHADOW and Reg. No. 3,247,745 for DAVIDOFF. All of the foregoing registrations are valid, subsisting, and in full force and effect. Moreover, as many of these registrations are incontestable pursuant to Section 15 of the Lanham Act, 15 U.S.C. § 1065, they serve as conclusive evidence of Zino Davidoff's ownership of the marks and of its exclusive rights to use the marks in commerce on or in connection with all of the goods identified in the registrations, as provided by Section 33(b) of the Lanham Act, 15 U.S.C. § 1115(b). True and correct copies of the foregoing registrations from the U.S. Patent and Trademark Office are attached as <u>Exhibit C</u>.

12.     Zino Davidoff exercises strict quality control over the production of its DAVIDOFF fragrances, their bottling, their completed packaging, and their distribution by Zino Davidoff's exclusive fragrance licensee Lancaster BV and U.S. sublicensee Coty US LLC (collectively "Coty"). Coty marks each unit of men's and women's DAVIDOFF eau de toilette,

as well as its outer packaging, with a Production Code. The Production Code is particularly important for maintaining the integrity of Zino Davidoff's DAVIDOFF fragrances. The Production Code provides full traceability for each DAVIDOFF fragrance unit on which it is placed from the moment the unit is produced to the point of consumer purchase. The Production Code permits Zino Davidoff and Coty to take corrective action in the event a product defect should arise and to protect the market from counterfeit products.

Defendant's Sale of Counterfeit DAVIDOFF Fragrances

13.    In or around late 2006, Zino Davidoff discovered counterfeit DAVIDOFF COOL WATER products in Target Corp.'s ("Target") stores. After contacting Target regarding its sale of Counterfeit DAVIDOFF Fragrances, Target identified Elizabeth Arden, Inc. ("Elizabeth Arden") as its supplier of these fragrance products. In or around early to mid-2007, Elizabeth Arden identified Prestige Fragrances, Inc. ("Prestige") as its supplier of Counterfeit DAVIDOFF Fragrances, and Prestige, in turn, identified ARC as one of its sources of Counterfeit DAVIDOFF Fragrances.

14.    ARC has been offering for sale and selling DAVIDOFF COOL WATER fragrances in multiple sizes bearing two Production Codes 0173289680 and 0172395837. A true and correct copy of an e-mail with attachment dated June 15, 2006 sent from Joseph Sollima at ARC to Prestige offering DAVIDOFF COOL WATER fragrances for sale bearing Production Codes 0173289680 and 0172395837 is attached as Exhibit D.

15.    After examining the photographs of the DAVIDOFF COOL WATER fragrances offered for sale by ARC (see Exhibit D), Zino Davidoff and Coty have confirmed that 0173289680 and 0172395837 are bogus Production Codes and therefore the DAVIDOFF COOL

US2000 10617302 6

WATER fragrances depicted in <u>Exhibit D</u>, and offered for sale and sold by ARC, are Counterfeit DAVIDOFF Fragrances.

16.     The Counterfeit DAVIDOFF Fragrances sold by Defendant use counterfeit copies of the DAVIDOFF marks and replicate the distinctive trade dress of Zino Davidoff's DAVIDOFF COOL WATER products.

<u>Defendant's Sale of Decoded DAVIDOFF Fragrances</u>

17.     "Decoded" DAVIDOFF fragrances are products from which Production Codes have been removed or obliterated.  The Production Codes on such products are removed with varying degrees of finesse.  Often, the Production Code is cut, abraded, or otherwise mutilated, giving the products a damaged appearance.

18.     Decoded DAVIDOFF Fragrances are generally sold by distributors who are not authorized to sell DAVIDOFF fragrance products in the United States.  In order to hide the fact that it is stolen or counterfeit product or to conceal the identity of the seller of the product, the Production Code has been removed from the bottom of the bottles and the exterior of the boxes, as shown in <u>Exhibit E</u>.

19.     DAVIDOFF fragrance products lacking a Production Code may be stolen or counterfeit, and are not subject to the same ongoing quality assurances as genuine product intended for sale in the U.S.

20.     In the June 15, 2006 e-mail referenced in paragraph 14 above, Mr. Sollima states that ARC has "decoded [DAVIDOFF] merchandise" in its warehouse.  *See* <u>Exhibit D</u>.

21.     Zino Davidoff does not countenance the sale of decoded DAVIDOFF products. In many instances, the removal of the Production Code and resulting mutilation of Decoded DAVIDOFF Fragrances degrades the products.  In addition, regardless of whether the product

packaging has been damaged, the removal of the Production Code significantly interferes with Plaintiff's anti-counterfeiting, quality control and anti-theft programs by hindering Plaintiff's ability to trace the products, thereby potentially endangering the public by preventing Plaintiff from identifying fakes, resolving quality problems, and recalling defective products. The removal of the Production Code and/or the mutilation of the packaging are each in and of themselves material differences from the authorized DAVIDOFF fragrances that are distributed by Coty in the U.S. The Decoded DAVIDOFF Fragrances are therefore infringing products under U.S. trademark law.

22.     Defendant's Counterfeit DAVIDOFF Fragrances and Decoded DAVIDOFF Fragrances are likely to deceive, confuse and mislead purchasers and prospective purchasers into believing that these unlicensed and unauthorized products are authorized and backed by Zino Davidoff, when in fact they are not. The likelihood of confusion, mistake and deception engendered by Defendant's unauthorized products is causing irreparable harm to Zino Davidoff.

23.     Purchasers and prospective purchasers viewing Defendant's unauthorized Counterfeit DAVIDOFF Fragrances and Decoded DAVIDOFF Fragrances and perceiving a defect, lack of quality, or any impropriety are likely to attribute them mistakenly to Zino Davidoff. In addition, due to the nature of the product at issue here, a topical cosmetic, Defendant's sale of Counterfeit DAVIDOFF Fragrances and Decoded Fragrances upon which there is no certification of quality poses a large risk to public health and safety. By causing such a likelihood of confusion, mistake, deception and potential public health risk, Defendant is inflicting irreparable harm to Zino Davidoff's goodwill.

24.     Upon information and belief, Defendant knowingly and willfully uses the DAVIDOFF Marks and sells the Counterfeit DAVIDOFF Fragrances and Decoded DAVIDOFF

Fragrances with the deliberate intent to ride on the fame and goodwill that Zino Davidoff has established in its DAVIDOFF fragrance brands, and with the deliberate attempt to create a false impression as to the source and sponsorship of Defendant's products and to dilute the distinctiveness of Zino Davidoff's marks. If Defendant's conduct is not enjoined, it will greatly injure the value of Zino Davidoff's marks and Zino Davidoff's ability to distinguish its goods.

25.    Defendant's conduct is intentionally fraudulent, malicious, willful and wanton.

## FIRST CLAIM FOR RELIEF FOR FEDERAL TRADEMARK INFRINGEMENT WITH RESPECT TO COUNTERFEIT DAVIDOFF FRAGRANCES (15 U.S.C. § 1114)

26.    Zino Davidoff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 25 above, and incorporates them herein by reference.

27.    Defendant's sale and distribution of products bearing counterfeit copies of the DAVIDOFF Marks is likely to cause confusion, mistake or deception as to the source or sponsorship of Defendant's Counterfeit DAVIDOFF Fragrances. As a result of Defendant's unauthorized use of Zino Davidoff's federally registered marks and/or imitations thereof, the public is likely to believe that Defendant's goods have been manufactured and/or approved by Zino Davidoff.

28.    Defendant's use of counterfeit copies of Zino Davidoff's marks falsely represents Defendant's Counterfeit DAVIDOFF Fragrances as emanating from or being authorized by Zino Davidoff and places beyond Zino Davidoff's control the quality of products bearing the DAVIDOFF Marks.

29.    Defendant's infringement of Zino Davidoff's registered marks is willful, intended to reap the benefit of the goodwill of Zino Davidoff, and violates Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

30.    The aforesaid conduct of Defendant is causing irreparable injury to Zino Davidoff and to its goodwill and reputation, and will continue to both damage Zino Davidoff and deceive the public unless enjoined by this Court. Zino Davidoff has no adequate remedy at law, injunctive relief is warranted considering the hardships between Zino Davidoff and Defendant and the public interest would not be disserved by enjoining Defendant's sale of Counterfeit DAVIDOFF Fragrances.

## SECOND CLAIM FOR RELIEF FOR FEDERAL TRADEMARK INFRINGEMENT WITH RESPECT TO DECODED DAVIDOFF FRAGRANCES (15 U.S.C. § 1114)

31.    Zino Davidoff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 30 above, and incorporates them herein by reference.

32.    The removal of the Production Code and/or mutilation of the packaging of Decoded DAVIDOFF Fragrances renders them materially different from Plaintiff's DAVIDOFF fragrances authorized for sale in the United States, and such products are not genuine.

33.    Defendant's unauthorized sale of Decoded DAVIDOFF Fragrances is likely to cause confusion, mistake or deception as to the source or sponsorship of Defendant's Decoded DAVIDOFF Fragrances. As a result of Defendant's unauthorized use of Zino Davidoff's federally registered marks, the public is likely to believe that Defendant's goods have been approved by Plaintiff.

34.    Defendant's unauthorized sale of Decoded DAVIDOFF Fragrances constitutes a false designation of origin and a false description or representation that Defendant's sale of such products is authorized by Plaintiff.

35.    The removal of the Production Code from the Decoded DAVIDOFF Fragrances deprives Plaintiff of the ability to ensure the consistently high quality of products bearing the DAVIDOFF Marks and to maintain the prestige and reputation of the DAVIDOFF brand. The

-10-

removal of the Production Code also hinders Plaintiff's ability to protect the market from counterfeit DAVIDOFF fragrance products.

36.     Defendant's infringement of Zino Davidoff's registered marks is willful, intended to reap the benefit of the goodwill of Zino Davidoff, and violates Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

37.     The aforesaid conduct of Defendant is causing irreparable injury to Zino Davidoff and to its goodwill and reputation, and will continue to both damage Zino Davidoff and deceive the public unless enjoined by this Court. Zino Davidoff has no adequate remedy at law, injunctive relief is warranted considering the hardships between Zino Davidoff and Defendant and the public interest would not be disserved by enjoining Defendant's sale of Decoded DAVIDOFF Fragrances.

## THIRD CLAIM FOR RELIEF FOR FEDERAL UNFAIR COMPETITION, FALSE DESCRIPTION AND FALSE DESIGNATION OF ORIGIN WITH RESPECT TO COUNTERFEIT DAVIDOFF FRAGRANCES (15 U.S.C. § 1125(a))

38.     Zino Davidoff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 37 above, and incorporates them herein by reference.

39.     Defendant's sale and distribution of products bearing counterfeit copies of the DAVIDOFF Marks constitutes a false designation of origin and a false description or representation that Defendant's Counterfeit DAVIDOFF Fragrances originate from, or are offered, sponsored, authorized, licensed by or otherwise somehow connected with Zino Davidoff, and is thereby likely to confuse consumers. As a result of Defendant's unauthorized use of the DAVIDOFF Marks and/or imitations thereof, the public is likely to believe that Defendant's goods have been manufactured and/or approved by Zino Davidoff.

US2000 10617302.6

40.     Defendant's use of counterfeit copies of Zino Davidoff's marks falsely represents Defendant's Counterfeit DAVIDOFF Fragrances as emanating from or being authorized by Zino Davidoff and places beyond Zino Davidoff's control the quality of products bearing the DAVIDOFF Marks.

41.     Defendant's conduct is willful, intended to reap the benefit of the goodwill of Zino Davidoff, and violates Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

42.     The aforesaid conduct of Defendant is causing irreparable injury to Zino Davidoff and to its goodwill and reputation, and will continue to both damage Zino Davidoff and deceive the public unless enjoined by this Court.  Zino Davidoff has no adequate remedy at law.

## FOURTH CLAIM FOR RELIEF FOR FEDERAL UNFAIR COMPETITION, FALSE DESCRIPTION AND FALSE DESIGNATION OF ORIGIN WITH RESPECT TO DECODED DAVIDOFF FRAGRANCES (15 U.S.C. § 1125(a))

43.     Zino Davidoff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 42 above, and incorporates them herein by reference.

44.     The removal of the Production Code and/or mutilation of the packaging of Decoded DAVIDOFF Fragrances renders them materially different from Plaintiff's DAVIDOFF fragrances authorized for sale in the U.S., and such products are not genuine.

45.     Defendant's unauthorized sale of Decoded DAVIDOFF Fragrances constitutes a false designation of origin and a false description or representation that Defendant's sale of such products is authorized by Plaintiff, and is thereby likely to confuse consumers.

46.     The removal of the Production Code from the Decoded DAVIDOFF Fragrances takes out of Plaintiff's control the quality of products bearing the DAVIDOFF Marks and deprives Plaintiff of the ability to maintain the prestige and reputation of the DAVIDOFF brand.

US2000 10617302.6

47.    Defendant is using the DAVIDOFF Marks with full knowledge that they are associated exclusively with Plaintiff and exclusively designate DAVIDOFF fragrances. Defendant's acts of unfair competition are willful and deliberate and with an intent to reap the benefit of the goodwill and reputation associated with Plaintiff's DAVIDOFF Marks.

48.    Defendant's sale and distribution of the Decoded DAVIDOFF Fragrances is in violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

49.    The aforesaid conduct of Defendant is causing irreparable injury to Zino Davidoff and to its goodwill and reputation, and will continue to both damage Zino Davidoff and deceive the public unless enjoined by this Court.  Zino Davidoff has no adequate remedy at law.

## FIFTH CLAIM FOR RELIEF FOR FEDERAL TRADEMARK DILUTION WITH RESPECT TO COUNTERFEIT DAVIDOFF FRAGRANCES AND DECODED DAVIDOFF FRAGRANCES (15 U.S.C. § 1125(c))

50.    Zino Davidoff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 49 above, and incorporates them herein by reference.

51.    Zino Davidoff's DAVIDOFF and COOL WATER marks are famous and well known throughout the United States, having been used exclusively and extensively for many years.  By reason of extensive advertising and use, Zino Davidoff's marks have become highly distinctive of Zino Davidoff's goods and are uniquely associated with Zino Davidoff.

52.    Defendant's commercial use of certain of the DAVIDOFF and COOL WATER marks on its Counterfeit DAVIDOFF Fragrances and Decoded DAVIDOFF Fragrances has diluted and continues to dilute the distinctive quality of Zino Davidoff's famous marks by lessening their capacity to identify and distinguish Zino Davidoff exclusively as the source of goods bearing or provided under the marks.

-13-

53.     Defendant's commercial use of the DAVIDOFF and COOL WATER marks further dilutes Zino Davidoff's marks by associating them with a product of inferior quality, thereby tarnishing the marks.

54.     Defendant's unlawful use of certain of the DAVIDOFF Marks is intended to and has the effect of trading on Zino Davidoff's reputation and causing dilution of Zino Davidoff's famous marks.

55.     Upon information and belief, Defendant does not own any federal or state registrations or trademark applications for any mark that includes, in whole or in part, any of the DAVIDOFF Marks and cannot assert any rights in the DAVIDOFF Marks that are prior to Zino Davidoff's first use of either mark.

56.     Defendant's conduct is in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

57.     The aforesaid conduct of Defendant is causing irreparable injury to Zino Davidoff and to its goodwill and reputation, and will continue to both damage Zino Davidoff and deceive the public unless enjoined by this Court.  Zino Davidoff has no adequate remedy at law.

## SIXTH CLAIM FOR RELIEF FOR STATE TRADEMARK DILUTION AND INJURY TO BUSINESS REPUTATION WITH RESPECT TO COUNTERFEIT DAVIDOFF FRAGRANCES AND DECODED DAVIDOFF FRAGRANCES

58.     Zino Davidoff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 57 above, and incorporates them herein by reference.

59.     Zino Davidoff, and its exclusive licensee Coty, have extensively and continuously promoted and used the DAVIDOFF Marks in the United States, and the marks have thereby become distinctive and well-known symbols of Zino Davidoff's fragrance products, with certain of the marks becoming famous.

-14-

60.     Defendant's commercial use of the DAVIDOFF Marks on Defendant's Counterfeit DAVIDOFF Fragrances and Decoded DAVIDOFF Fragrances has diluted and continues to dilute the distinctive quality of Zino Davidoff's marks by lessening their capacity to identify and distinguish Zino Davidoff exclusively as the source of goods bearing or provided under the marks.

61.     Defendant's commercial use of the DAVIDOFF Marks further dilutes Zino Davidoff's marks by associating them with a product of inferior quality, thereby tarnishing the marks.

62.     Defendant's actions demonstrate an intentional, willful, and malicious intent to trade on the goodwill associated with Zino Davidoff's DAVIDOFF Marks or to cause dilution of the DAVIDOFF Marks, to the great and irreparable injury of Zino Davidoff.

63.     Defendant is causing and will continue to cause irreparable injury to Zino Davidoff's goodwill and business reputation, and dilution of the distinctiveness and value of Zino Davidoff's famous and distinctive DAVIDOFF Marks in violation of the New York, New Jersey and Connecticut anti-dilution acts, N.Y. GEN. BUS. Law § 360-l (McKinney 2008), N.J. STAT. ANN. 56:3-13.20 (West 2003) and CONN. GEN. STAT. ANN § 35-11i(c) (West 2003) respectively, as well as upon information and belief the anti-dilution laws of the several states, including Alabama, ALA. CODE § 8-12-17 (2003); Alaska, ALASKA STAT. §45.50.180 (Michie 2002); Arizona, ARIZ. REV. STAT. ANN. § 44-1448.01 (West 2003); Arkansas, ARK. CODE ANN. § 4-71-213 (2002); California, CAL. BUS. & PROF. CODE § 14330 (West 2003); Delaware, DEL. CODE ANN. tit. 6, § 3313 (2002); Florida, FLA. STAT. ANN. § 495.151 (West 2003), Georgia, GA. CODE ANN. § 10-1-451 (2003); Hawaii, HAW. REV. STAT. ANN. § 482-32 (Michie 2003); Idaho, IDAHO CODE § 48-513 (Michie 2002); Illinois, 765 ILL.

-15-

COMP. STAT. ANN. 1036/65 (2003); Iowa, IOWA CODE ANN. § 548.113 (West 2003); Kansas, KAN. STAT. ANN. § 81-214 (2002); Louisiana, LA. REV. STAT. ANN. § 51:223.1 (West 2003); Maine, ME. REV. STAT. ANN. tit. 10, § 1530 (West 2003); Massachusetts, MASS. GEN. LAWS. ANN. ch. 110B, § 12 (West 2003); Minnesota, MINN. STAT. ANN. § 333.285 (West 2003); Mississippi, MISS. CODE. ANN. § 75-25-25 (2003); Missouri, MO. ANN. STAT. § 417.061(1) (West 2002); Montana, MONT. CODE ANN. § 30-13-334 (2003); Nebraska, NEB. REV. STAT. ANN. § 87-140 (Michie 2002); New Hampshire, N.H. REV. STAT. ANN. § 350-A:12 (2003); New Mexico, N.M. STAT. ANN. § 57-3B-15 (Michie 2002); Oregon, O.R.S. § 647.107 (2003); Pennsylvania, 54 PA. CONS. STAT. ANN. § 1124 (West 1996); Rhode Island, R.I. GEN. LAWS § 6-2-12 (1992); South Carolina, S. C. CODE ANN. § 39-15-1165 (2002); Tennessee, TENN. CODE ANN. § 47-25-513 (2003); Texas, TEX. BUS. & COM. CODE ANN. § 16.29 (Vernon 2003); Utah, UT. CODE ANN. § 70-3a-403 (2002); Washington, WASH. REV. CODE ANN. § 19.77.160 (2003); West Virginia, W. VA. CODE ANN. 47-2-13 (Michie 2003); and Wyoming, WYO. STAT. ANN. § 40-1-115 (Michie 2002).

64.    Zino Davidoff therefore is entitled to injunctive relief, damages and costs, as well as, if appropriate, enhanced damages and reasonable attorneys' fees.

## SEVENTH CLAIM FOR RELIEF FOR STATE TRADEMARK INFRINGEMENT WITH RESPECT TO COUNTERFEIT DAVIDOFF FRAGRANCES (N.Y. ART & CULT. AFF. LAW § 33.09)

65.    Zino Davidoff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 64 above, and incorporates them herein by reference.

66.    Defendant's sale and distribution of products bearing counterfeit copies of the DAVIDOFF Marks is likely to cause confusion, mistake or deception as to the source or sponsorship of Defendant's Counterfeit DAVIDOFF Fragrances.  As a result of Defendant's

-16-

unauthorized use of Zino Davidoff's federally registered marks and/or imitations thereof, the public is likely to believe that Defendant's goods have been manufactured and/or approved by Zino Davidoff.

67.    Defendant's use of counterfeit copies of Zino Davidoff's marks falsely represents Defendant's Counterfeit DAVIDOFF Fragrances as emanating from or being authorized by Zino Davidoff and places beyond Zino Davidoff's control the quality of products bearing the DAVIDOFF Marks.

68.    Defendant's sales of Counterfeit DAVIDOFF Fragrances were made with the knowledge that the marks affixed to these fragrances were counterfeit and that the sales were made without Zino Davidoff's consent.  This conduct violates New York Art & Cultural Affairs Law § 33.09(3).

69.    Upon information and belief, Defendant has in its possession counterfeit DAVIDOFF Marks, with the knowledge that such marks are counterfeit.  This conduct violates New York Art & Cultural Affairs Law § 33.09(4).

70.    The aforesaid conduct of Defendant is causing irreparable injury to Zino Davidoff and to its goodwill and reputation, and will continue to both damage Zino Davidoff and deceive the public unless enjoined by this Court.  Zino Davidoff has no adequate remedy at law, injunctive relief is warranted considering the hardships between Zino Davidoff and Defendant and the public interest would not be disserved by enjoining Defendant's sale of Counterfeit DAVIDOFF Fragrances.

## EIGHTH CLAIM FOR RELIEF FOR COMMON LAW UNFAIR COMPETITION WITH RESPECT TO COUNTERFEIT DAVIDOFF FRAGRANCES

71.    Zino Davidoff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 70 above, and incorporates them herein by reference.

"You must take positions, even if you are not a proprietary trader," said this employee, who insisted on anonymity because he was not authorized to talk to the press. "During appraisals by bosses, they made it clear you were judged by how well you did your basic job, as well as how much money you made on prop trades."

Mr. Kerviel told French prosecutors as much. Asked if his superiors knew of his activities, he said, "at the beginning, just as at the end of my maneuvers, they didn't want to intervene," adding, "They know the machinery."

Emphasis added.

48.    The New York Times article noted that, according to analyst Pascal Decque, SocGen's willingness to take risks also was reflected by its loss of over €2 billion from subprime-related investments, twice the size of the losses of BNP Paribus, even though BNP is a larger bank than SocGen.

**Internal Knowledge of Kerviel's Trading**

49.    Kerviel's trading appears to have been known within SocGen, which recklessly turned a "blind eye" to the unauthorized trading, contrary to Defendants' representations to investors throughout the Class Period regarding SocGen's strict controls on risk and daily-implementation of internal controls on all trading positions.

50.    On February 15, 2008, The New York Times reported that a confidential source who was well-acquainted with the trading controls at SocGen said that it was "inconceivable" that Kerviel's immediate supervisors were not alerted after his trades set off alarm bells at Eurex (the derivatives exchange based in Frankfurt). The source reported that on a least one occasion in late 2006 or early 2007, Kerviel made a €500,000 profit on a one-way bet. As Kerviel's role was not to speculate with SocGen's money, Kerviel was reprimanded by his bosses, who said his profit would not be included in the tally used to calculate year-end bonuses. According to the

18

source, this incident would have been sufficient grounds to fire Kerviel, and Kerviel would normally have been watched closely afterward, and not allowed to take additional risks. The source's report lent credence to Kerviel's claims, during Kerviel's interrogation by the French financial police in late January 2008, that his superiors, who were experienced foreign traders, received clear and repeated warnings that Kerviel was trading beyond his limits.

51.    Kerviel also told police that his supervisors in the Delta One derivative trading office, Martial Rouyere (head of Delta One) and Eric Cordelle (Royere's debuty), were familiar with his overreaching limits since April 2007. Further, Moussa Bakir, a broker at SocGen's futures brokerage, Newedge, told police when he was questioned that he knew that Kerviel had a problem with his bosses. On January 29, 2008, the Associated Press reported that a judicial official said that Kerviel told investigators that he believes that his bosses at SocGen were aware of his massive risk-taking but turned a blind eye as long as he earned money. According to excerpts of Kerviel's testimony published in Le Monde newspaper, Kerviel told investigators: "I can't believe that my superiors were not aware of the amounts that I was committing, it is impossible to generate such profits with small positions." Kerviel's remarks were confirmed by Isabelle Montagne, a spokeswoman for the Paris prosecutor's office.

52.    On March 14, 2008, The New York Times reported that Kerviel told French investigators that Thomas Mougard, an assistant on his desk, conducted at least one large fictitious transaction last spring on the computer of their supervisor Eric Cordelle, as the supervisor looked on. Mr. Kerviel told investigators that he was making speculative bets of as much as $925 million "at the workstation of his direct superior, Eric Cordelle, and in his presence." Mr. Mougard said that he "could not exclude" the possibility that on some occasions

he "may have forgotten to log off when he was using Jerome Kerviel's workstation to access certain timely information."

53.     Kerviel told police that other traders and managers hid gains and losses to smooth over earnings, and that his superiors must have been aware of what he was doing.  He said his managers went along because they too would have been fired had his unauthorized trading been exposed.

54.     In an interview by Maria Baritiromo published in <u>Business Week</u> on February 11, 2008, French Finance Minister Christine LaGarde also acknowledged SocGen's awareness of irregular trades early on:

> Q (Baritoromo): It has been reported that, according to prosecutors, SocGen was made aware of irregular trades in 2005.  And then in November of last year [2007], they were again made aware of questionable trades by this very same trader.

> A (LaGarde): It's certainly going to be part of our investigation, and I have my people working on that at the moment.  I'm going to see what the governor of the central bank and the president of the AMF, which is the equivalent of the SEC, have to say about why they did not disclose earlier.

## Lack of Functional Controls and Risk Management

55.     On February 4, 2008, French Finance Minister Christine Lagarde submitted an 11-page report to the French prime minister on the SocGen trading scandal.  The reported noted that SocGen took too long to report the suspicious activity to government officials.

56.     Lagarde's harshest comments concerned SocGen's controls.  Lagarde told reporters after submitting her report, "Very clearly, certain mechanisms of internal controls of Société Générale did not function, and those that functioned were not always followed by appropriate modifications."  Among problems the report cited at Société Générale were cracks in

the wall separating the trading floor and the offices where trades are controlled; problems with computer passwords and other security measures; and "atypical behavior" such as Kerviel not taking vacation days that went unnoticed.

57. During her <u>Business Week</u> interview on February 11, 2008, in response to a question as to what could be done to avoid future SocGen-type situations, French Finance Minister LaGarde discussed the need for three types of transparency: transparency of financial instruments (LaGarde noted that this "addresses the subprime issue"), transparency of the entire reality of financial institutions' balance sheets and accounts, and transparency of relationships within trading rooms and between trading rooms and control areas.

58. Various experts also criticized SocGen's risk management procedures, in light of SocGen's trading loss pertaining to Kerviel. Joseph Mason, a risk-management researcher and professor of finance at Drexel University in Philadelphia, stated "I find it really improbable that this trader was not abetted by at the very least incompetence, if not assistance from others. Ultimately, we're talking about a breakdown of fundamental operational controls." According to Francis Hontmongandji, a corporate governance expert who is also president of the French chapter of the Association of Certified Fraud Examiners, given that Mr. Kerviel was able to exceed trading limits and evade detection for so long, as well as Société Générale's handling of Eurex's November warnings, "we can easily infer that the internal controls were either inadequately designed or have not been operating effectively and efficiently." David Moss, a fund manager at F&C Asset Management in London, said "the systems controls didn't function."

**Indications That Kerviel Did Not Act Alone**

59.    News reports in mid-February indicated that police investigating the trading scandal at Société Générale were leaning towards a theory that Kerviel, whom the bank blamed for losing nearly US $7.2 billion, might not have acted alone, as he and the bank have claimed. The police had been sifting through nearly 2000 pages of instant message traffic that Jerome Kerviel had sent. The police believed that Kerviel may have been trying to protect a friend who appeared to have helped him cover his tracks.

60.    The instant message exchange added to doubts about Société Générale's explanation that Kerviel had engaged in the trades alone.

61.    Investigators suspected that Moussa Bakir, 32, a broker at the futures brokerage Newedge, a Société Générale subsidiary, sent Mr. Kerviel a forged email message from Deutsche Bank, purporting to confirm a sizeable trade in German DAX index futures that did not exist.

62.    Late on the afternoon of January 18, 2008, the day Société Générale said it uncovered roughly US $74 billion worth of fictitious trades by Kerviel, Mr. Bakir indicated in a message exchange over the Reuters terminal system that he would send Kerviel documentation for an unspecified transaction. "I'm sending you the conf," Bakir wrote, using the shorthand for the confirmation of a trade.

63.    Kerviel and Bakir's messages -- which indicated that they continued many of their conversations on mobile phones suggested that Bakir had an intimate knowledge of Kerviel's surreptitious trading.

V.    **THE TRUTH BEGINS TO EMERGE**

64.    After repeatedly assuring investors during the Class Period that SocGen's subprime exposure was minimal, and that SocGen had comprehensive internal controls and risk management procedures, involving the careful and prudent monitoring of all trades, investors were shocked on January 23, 2008 (the last day of the Class Period), when market rumors indicated that SocGen had significant exposure to subprime CDOs and RMBS which would require substantial additional writedowns.

65.    Investors were further shocked by SocGen's announcement at 2:00 a.m. E.S.T. on Thursday, January 24, 2008 (before the markets opened) of €4.9 billion of losses due to Kerviel's trading and €2.05 billion of writedowns related to (subprime) "credit market turbulence." As a result, SocGen's ADRs fell $1.95, from a close of $24.25 on January 23 to close at $22.30 on January 24, 2008 (and continued to drop over the next 2 trading days to $21.50), on extremely heavy trading volume.

66.    After two years of unauthorized trading by Kerviel, according to SocGen, on Friday, January 18, 2008, a routine check found a trade that exceeded the bank's limits. A call to the other party in the trade found the transaction didn't exist. Kerviel had built up €50 billion of positions -- which was more than the entire market capitalization of the Company — in European stock index futures and disguised them with fake hedges.

67.    SocGen quickly unwound Kerviel's positions on January 21, 22 and 23, 2008, and then announced on January 24, 2008 that it uncovered a $7.14 billion fraud - one of history's biggest as well as additional subprime losses.

68.    SocGen stated that it lost €4.82 billion ($7.09 billion) in cleaning up unauthorized transactions by Kerviel. The trading loss, and losses from the crisis in U.S. subprime mortgage loans, wiped out the bulk of SocGen's net profit for 2007. SocGen said it would be forced to seek $8.02 billion in new capital.

69.    SocGen also announced that Kerviel confessed to the fraud, and was being dismissed from his position at SocGen. Kerviel's supervisors were also to leave SocGen. Chief Executive Daniel Bouton offered his resignation, but the board rejected it. (SocGen made a number of personnel changes in its derivative business, and replaced its co-heads of fixed income, Marc Bruillout and Gregorie Varenne.)

70.    In a press release issued January 27, 2008, entitled "Explanatory note about the exceptional fraud," SocGen described Kerviel's methods, including fictitious operations which gave an appearance of offsets to the actual portfolio operated by Kerviel. The press release set forth a time line purporting to describe the conditions under which the fraud was uncovered, as follows: Under the entry for January 18, 2008, SocGen admitted that "abnormal counterparty risk on a broker [was] detected several days earlier [several days prior to Friday January 18, 2008]." The press release claimed that the team to start investigating the situation was created on January 18, 2008, and that on January 19, 2008, Kerviel acknowledged committing unauthorized acts and creating fictitious operations. By Sunday January 20, 2008, Kerviel's positions, amounting to approximately €50 billion, were identified, and Bouton informed the Governor of the Banque de France. An Audit Committee meeting was convened that afternoon to examine the results for 2007 and writedowns related to US residential mortgage assets (in particular' CD0s). At this meeting, Bouton informed the Audit Committee of the trader's position which

24

had been uncovered. Bouton then also informed the general secretary of the AMF. From January 21 through 23, 2008, SocGen unwound Kerviel's positions in a measured fashion, under unfavorable market conditions.

71.    The press release noted that before the markets opened on Thursday, January 24, 2008, the existence of the fraud was announced, and SocGen asked for trading in its shares to be suspended. It also noted that investigations were under way by SocGen's General Inspection division and Banque de France.

72.    On January 28, 2008, investigating judges filed preliminary charges against Kerviel, after questioning him for 48 hours. The preliminary charges were for breach of trust, "forgery and using forgeries" and unauthorized computer activity, which could bring Kerviel up to three years in prison and hefty fines. Such preliminary charges allow the magistrates time to further investigate and to decide whether to send the case to trial. The prosecutor said that in November 2007, Eurex "became concerned" by a position taken by Kerviel. However, Kerviel was able to wiggle out, the prosecutor said.

73.    On or about January 29, 2008, the ADAM organization, which represents the interests of small shareholders, asked France's AMF financial markets regulator to investigate SocGen. ADAM President Colette Neuville said in a letter that she was surprised by the difference between a reassurance given over SocGen's subprime debt position in September 2007, and the €2.05 billion ($3.03 billion) in additional write-downs announced on January 24, 2008. Ms. Neuville also asked AMF to look into possible insider dealing because the share price of SocGen started to fall from January 14, 2008, ten days before the announcements of the €4.9 billion in trading losses and additional subprime writedown, and planned capital increase.

25

74.     On January 30, 2008, SocGen director Jean-Martin Folz issued a press release, stating that SocGen's Board of Directors met on January 30, 2008, and decided to form a special committee of independent directors, comprised of Jean Azema, Antoine Jeancourt-Galignani, and Jean-Martin Folz (who was appointed Chairman of the special committee) to launch an independent, thorough inquiry into the fraud.

75.     On February 8, 2008, a Paris court ordered that Kerviel be placed in pre-trial custody, reversing a ruling the previous week that Kerviel could remain free while his case was being investigated.  Kerviel is being investigated on accusations of forgery, breach of trust and illegal computer use.

76.     On February 9, 2008, after two days of questioning by the police, Moussa Bakir, a broker at FIMAT who exchanged emails with and executed trades for Kerviel, was released without charge.

77.     Kerviel's trading losses, along with the writedowns and provisions linked to the U.S. subprime mortgage crash, forced Société Générale to raise €5.5 billion from shareholders in February 2008 to replenish capital.  SocGen said it would sell shares in a rights offer at €47.50 each, a discount of 39% to the closing price on February 8, 2008.  Analysts had expected a discount of as much as 30%.

78.     On February 11, 2008, Société Générale also filed a lawsuit against "a 31-year-old person" for creating fraudulent documents, using forged documents and making attacks on an automated system, according to Clarisse Grillon, a spokeswoman for the Nanterre prosecutor.

79.     In February, 2008, a French magazine, Le Nouvel Observateur, printed nearly 2,000 pages of electronic messages which Balch and Kerviel exchanged between early October

26

2007 and January 18, 2008, Kerviel's last day at SocGen. According to reports, SocGen also provided the email messages to prosecutors, In one message, sent on November 30, 2007, Bakir said that in his opinion, Kerviel's actions were not "illegal in terms of the law."

**The Interim Investigative Report**

80.     On February 20, 2008, an interim report from the inquiry by three independent SocGen board members, chaired by former Peugeot Citroen chief executive Jean- Martin Folz, was published. The initial findings were reviewed by auditors at PricewaterhouseCoopers. The investigative report stated that Kerviel began making unauthorized transactions beginning in 2005, almost immediately after he moved to SocGen's Delta One equity derivatives trading desk. Lapses in the internal controls let the trades go undiscovered until January 2008. According to the report, Kerviel initially bought options and warrants on individual stocks, including Allianz, Deutsche Bank and Porsche. In 2007, Kerviel moved on to take large positions on stock index futures and forwards. Beginning in March 2007, Kerviel built up a short position in index futures that reached a notional value of €28 billion by June 30, 2007. That position was unwound in November, 2007, resulting in a profit of €1.5 billion. In January 2008, Kerviel took €49 billion of long positions on index futures. SocGen incurred €6.4 billion of losses unwinding these positions from January 21 to 23, 2008. The report confirmed that SocGen's "global loss" from Kerviel's trading (apparently after netting gains against losses) was €4.9 billion.

81.     The investigative report catalogued 75 instances when Kerviel's trading raised alarm bells, and better systems might have prevented the alleged fraud. The report said that SocGen management failed to follow up on 74 of the warnings over more than two years about Kerviel's trading, adding to questions about oversight at SocGen. Its response came only after

27

the 75 warning. In some cases, the report said that "operating staff did not systematically carry out more detailed checks" of Kerviel's trades. The report also found that "no initiative was taken to verify the truth of [Kerviel]s assertions or to transmit the information to immediate supervisors." The report also said that some work still needed to be done to confirm that the entire impact of Kerviel's trading has been identified.

82.     Although the internal inquiry also found that Kerviel's allegedly unauthorized trading had not been detected because of Kerviel's sophisticated techniques, it also pointed the finger at internal audit and risk control failures. The inquiry also highlighted that controllers did not "systematically carry out more detailed checks" and pointed to an absence of controls likely to identify fraud. The report suggested the strengthening of three areas, namely, computer security, procedures to tip off the management of wrongdoing, and stronger human resources checks.

83.     The committee report also said that the 75 red flags between June 2006 and the beginning of 2008 should have alerted managers to Kerviel's unauthorized trades. The warning signs included a trade with a maturity date on a Saturday, trades with "pending" counterparties, and trades with missing broker names, according to the investigative report. The report said that while procedures were respected and questions were asked, "no initiative was taken" to check Kerviel's assertions, "even when those lacked probability." Moreover, "the next level of superiors failed to react when notified."

84.     The interim investigative report indicated that the independent committee would continue its work and present an update at SocGen's shareholders' meeting on May 27, 2008.

85.    SocGen's shares fell 28 percent during the first two months of 2008, compared with a 16 percent decline in the 60-member Bloomberg European Banks and Financial Services Index. The decline exceeded the 19 percent slump in BNP Paribas SA, France's biggest bank, which reported a 42 percent drop in 4Q2007 profit to €1.01 billion on February 20, 2008.

**SocGen's Announcement of 4Q 2007 and FY 2007 Results**

86.    On February 21, 2008, SocGen issued a press release announcing that unauthorized trading and subprime-related writedowns led to a record €3.35 billion ($ 4.9 billion) fourth-quarter loss. This net loss compared with profit of €1.18 billion in 4Q2006. For the full year of 2007, SocGen announced that its net income fell to €947 million from €5.22 billion, matching preliminary results announced on February 11, 2008. SocGen blamed the reversal mostly on unauthorized trades by Kerviel, whose positions led to €4.9 billion of trading losses, and on the effects of the serious financial crisis on SocGen's Corporate and Investment Banking and Asset Management activities. Although SocGen claimed that it did not discover Kerviel's positions until January 18, 2008, Société Générale booked the losses in the fourth quarter of 2007.

87.    SocGen also said in its February 21, 2008 press release that it would cut its dividend to €0.90 a share from €5.20, maintaining a policy of paying out about 45 percent of profit.

88.    Frederic Oudea, SocGen's chief financial officer, said on the conference call that some further writedowns in money market funds may be necessary in the first quarter of 2008 if credit markets do not improve.

## VI.   LOSS CAUSATION

89.    As a result of Defendants' false and misleading statements and omissions described herein, the price of SocGen's ADRs was artificially inflated during the Class Period, causing harm to Plaintiff and other Class members. Plaintiff and the Class suffered actual economic loss when the risk, subprime exposure and internal control problems and their adverse impact were disclosed to the market, causing the inflation to be removed from SocGen's ADR price.

90.    Investors were shocked on January 23, 2008 (the last day of the Class Period), when market rumors indicated that SocGen had significant exposure to subprime CDOs and RMBS which would require substantial additional write-downs. SocGen further shocked investors by announcing, at 2:00 a.m. E.S.T. on January 24, 2008, €4.9 billion of losses due to Kerviel's trading and €2.05 billion of write-downs related to (subprime) "credit market turbulence." As a result, SocGen's ADRs fell $1.95, from a close of $24.25 on January 23 to close at $22.30 on January 24, 2008 (and continued to drop over the next 2 trading days to $21.50), on extremely heavy trading volume (over 2,500,000 ADR shares), removing the artificial inflation from the ADR stock price. As a direct result, Plaintiff and the Class suffered economic loss, i.e., damages under the federal securities laws.

## VII.   CLASS ACTION ALLEGATIONS

91.    This class action is brought pursuant to Fed. R. Civ. P. Rule 23 on behalf of all persons who purchased SocGen ADRs during the Class Period (the "Class"), and all U.S. citizens who purchased SocGen securities on any exchange, excluding Defendants, SocGen's

officers and directors, and their immediate families, legal representatives, heirs, successors or

assigns and any entity in which Defendants have or had a controlling interest. Class members are

so numerous that joinder is impracticable. SocGen has millions of ADRs outstanding, owned by

numerous persons. Average weekly trading volume of SocGen's ADRs during the Class Period

was approximately 147,060 ADRs per week.

92.     Questions of law and fact common to the Class predominate over questions

affecting individual Class members. Common questions include: (a) whether Defendants

violated the 1934 Act; (b) whether Defendants omitted and/or misrepresented material facts; (c)

whether Defendants knew or deliberately disregarded that their statements were false and

misleading; (d) whether SocGen ADRs' price was artificially inflated; and (e) the extent and

appropriate measure of damages.

93.     Plaintiff's claims are typical of those of the Class. Plaintiff and the Class

sustained damages from Defendants' wrongful conduct. Plaintiff has no interests conflicting

with the Class and will adequately protect the Class' interests. Plaintiff has retained experienced

securities class action counsel. A class action is superior to other available methods for the fair

and efficient adjudication of this controversy.

## FIRST CLAIM FOR RELIEF

### For Violation of §10(b) of the 1934 Act
### and Rule 10b-5 Against All Defendants

94.     Plaintiff incorporates the foregoing allegations by reference.

95.     During the Class Period, Defendants violated § 10(b) of the 1934 Act and Rule

10b-5 by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements

31

of material facts or omitting material facts needed to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaging in acts, practices, and a course of business that operated as a fraud or deceit upon the Class. Defendants also failed to disclose material adverse information in connection with their insider sales of SocGen stock.

96.     The market for SocGen securities was open, well-developed and efficient at all relevant times. Defendants' materially false and misleading statements and omissions caused SocGen ADRs and other securities to trade at artificially-inflated prices during the Class Period. Plaintiff and the Class were damaged because they acquired SocGen ADRs and other securities relying upon the market's integrity, and would not have purchased at the prices they paid, or at all, if they had known that Defendants' misleading statements and omissions artificially inflated market prices, and because when the truth was revealed, SocGen's ADRs and other securities declined dramatically, directly causing investors' losses.

### SECOND CLAIM FOR RELIEF

#### For Violation of §20(a) of the 1934 Act, Against Individual Defendants

97.     Plaintiff incorporates the foregoing allegations by reference.

98.     The Individual Defendants acted as controlling persons of SocGen within the meaning of §20(a) of the 1934 Act and are liable thereunder. As officers and/or directors of SocGen, owners of SocGen stock, and "hands on" managers, the Individual Defendants had the power and authority to cause SocGen to engage in the wrongful conduct complained of herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the Class, prays for judgment as follows:

A.    declaring this action to be a plaintiff class action properly maintained pursuant to Rule 23(a) and (b) (3) of the Federal Rules of Civil Procedure;

B.    appointing Plaintiff as lead plaintiff and class representative and his counsel as lead class counsel;

C.    awarding Plaintiff and other members of the Class damages together with pre-judgment interest thereon;

D.    awarding Plaintiff and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

E.    awarding Plaintiff and other members of the Class such other and further relief as may be just and proper under the circumstances.

33

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:    March 19, 2008
          New York, New York

                              **WEISS & LURIE**

                              Joseph H. Weiss (JW-4534)
                              James E. Tullman (JT-9597)
                              Richard A. Acocelli (RA-2029)
                              551 Fifth Avenue
                              New York, New York  10176
                              (212) 682-3025
                              (212) 682-3010 (Fax)

                              **STULL, STULL & BRODY**
                              Jules Brody (JB-9151)
                              6 East 45th Street
                              New York, New York 10017
                              (212) 687-7230
                              (212) 490-2022 (Fax)

                              Attorneys for Plaintiff

Int. Cl.: 3

Prior U.S. Cls.: 51 and 52

## United States Patent and Trademark Office

Reg. No. 1,735,958
Registered Dec. 1, 1992

### TRADEMARK
### PRINCIPAL REGISTER



DAVIDOFF EXTENSION S.A. (SWITZERLAND CORPORATION)
ALPENSTRASSE 14
6300 ZUG, SWITZERLAND

FOR: TOILETRIES; NAMELY, EAU DE TOILETTE, AFTERSHAVE LOTION, SKIN ENERGIZER (TONIC), SHOWER GEL, SHAMPOO, BODY LOTION, PERSONAL DEODORANTS AND ANTIPERSPIRANTS, AND BODY SOAP, IN CLASS 3 (U.S. CLS. 51 AND 52).

FIRST USE 6-0-1988; IN COMMERCE 6-6-1989.

OWNER OF U.S. REG. NOS. 1,432,571, 1,538,769 AND OTHERS.

SER. NO. 74-153,663, FILED 4-1-1991.

STEPHEN JEFFRIES, EXAMINING ATTORNEY

Int. Cl.: 3

Prior U.S. Cls.: 51 and 52

**United States Patent and Trademark Office**

Reg. No. 1,735,965
Registered Dec. 1, 1992

## TRADEMARK
### PRINCIPAL REGISTER

### COOL WATER

DAVIDOFF EXTENSION S.A. (SWITZERLAND CORPORATION)
ALPENSTRASSE 14
6300 ZUG, SWITZERLAND

FOR: TOILETRIES; NAMELY, EAU DE TOILETTE, AFTERSHAVE LOTION, SKIN ENERGIZER (TONIC), SHOWER GEL, SHAMPOO, BODY LOTION, PERSONAL DEODORANTS AND ANTIPERSPIRANTS, AND BODY SOAP, IN CLASS 3 (U.S. CLS. 51 AND 52).

FIRST USE 6-0-1988; IN COMMERCE 6-6-1989.

SER. NO. 74-185,501, FILED 7-16-1991.

STEPHEN JEFFRIES, EXAMINING ATTORNEY

Int. Cl.: 3

Prior U.S. Cls.: 51 and 52

## United States Patent and Trademark Office

Reg. No. 1,744,198
Registered Jan. 5, 1993

### TRADEMARK
### PRINCIPAL REGISTER



DAVIDOFF EXTENSION S.A. (SWITZERLAND CORPORATION)
ALPENSTRASSE 14
6300 ZUG, SWITZERLAND

FOR: EAU DE TOILETTE, SHAVING CREAM, AFTERSHAVE LOTION, PRE-ELECTRIC SHAVE LOTION, TOILET SOAP, SKIN LOTION, HAIR LOTION, SHOWER GEL, IN CLASS 3 (U.S. CLS. 51 AND 52).

PRIORITY CLAIMED UNDER SEC. 44(D) ON SWITZERLAND APPLICATION NO. 388859, FILED 3-14-1991, REG. NO. 388859, DATED 3-14-1991, EXPIRES 3-14-2011.
OWNER OF U.S. REG. NOS. 1,432,571, 1,538,769 AND OTHERS.

SER. NO. 74-153,661, FILED 4-1-1991.

STEPHEN JEFFRIES, EXAMINING ATTORNEY

Int. Cl.: 3

Prior U.S. Cls.: 51 and 52

## United States Patent and Trademark Office

Reg. No. 1,753,520
Registered Feb. 23, 1993

## TRADEMARK
### PRINCIPAL REGISTER



DAVIDOFF EXTENSION S.A. (SWITZERLAND CORPORATION)
ALPENSTRASSE 14
6300 ZUG, SWITZERLAND

FOR: EAU DE TOILETTE, SHAVING CREAM, AFTER SHAVE LOTION, PRE-ELEC-TRIC SHAVE LOTION, TOILET SOAP, SKIN LOTION, HAIR LOTION, SHOWER GEL, IN CLASS 3 (U.S. CLS. 51 AND 52).

PRIORITY CLAIMED UNDER SEC. 44(D) ON SWITZERLAND APPLICATION NO. 390151, FILED 3–14–1991, REG. NO. 390151, DATED 3–14–1991, EXPIRES 3–14–2011.

OWNER OF U.S. REG. NOS. 1,432,571, 1,538,769 AND OTHERS.

THE DRAWING IS LINED FOR THE COLORS GREEN AND BLUE, AND COLOR IS CLAIMED AS A FEATURE OF THE MARK.

THE MARK CONSISTS OF THE WORDING "DAVIDOFF" AND "RELAX" ON A BLACK, GREEN AND BLUE BACKGROUND OF MIS-CELLANEOUS DESIGN.

SER. NO. 74–155,199, FILED 4–8–1991.

STEPHEN JEFFRIES, EXAMINING ATTOR-NEY

Int. Cl.: 3

Prior U.S. Cls.: 1, 4, 6, 50, 51 and 52

Reg. No. 2,609,218

## United States Patent and Trademark Office

Registered Aug. 20, 2002

### TRADEMARK
### PRINCIPAL REGISTER

### DAVIDOFF

DAVIDOFF & CIE SA (SWITZERLAND COR-
PORATION)
2 RUE DE RIVE
1200 GENEVA, SWITZERLAND

FOR: COSMETICS, NAMELY, EAU DE TOIL-
ETTE, PERFUMES, PRE-SHAVE AND AFTER-
SHAVE PREPARATIONS, SKIN ENERGIZING
TONIC, SHOWER GEL, BODY SOAP, HAIR SHAM-
POO; SUN PROTECTION, AFTER SUN AND TAN-
NING PREPARATION, BODY LOTION, PERSONAL
DEODORANTS AND ANTIPERSPIRANTS, IN
CLASS 3 (U.S. CLS. 1, 4, 6, 50, 51 AND 52).

FIRST USE 0-0-1984; IN COMMERCE 0-0-1991.

OWNER OF U.S. REG. NOS. 1,052,564, 1,432,571
AND OTHERS.

SEC. 2(F).

SER. NO. 76-224,810, FILED 3-13-2001.

LOURDES AYALA, EXAMINING ATTORNEY

Int. Cl.: 3

Prior U.S. Cls.: 1, 4, 6, 50, 51 and 52

**United States Patent and Trademark Office**

Reg. No. 2,723,215

Registered June 10, 2003

## TRADEMARK
### PRINCIPAL REGISTER



DAVIDOFF & CIE SA (SWITZERLAND COR-
  PORATION)
2 RUE DE RIVE
1200 GENEVA, SWITZERLAND

FOR: EAU DE TOILETTE, AFTERSHAVE LO-
TION, SKIN ENERGIZING TONIC, SHOWER GEL,
HAIR SHAMPOO, BODY LOTION, PERSONAL
DEODORANT, ANTIPERSPIRANT, IN CLASS 3
(U.S. CLS. 1, 4, 6, 50, 51 AND 52).

FIRST USE 0-0-1988; IN COMMERCE 0-0-1992.

THE STIPPLING ON THE MARK IS USED FOR
SHADING PURPOSES ONLY AND IS NOT A FEA-
TURE OF THE MARK.

SEC. 2(F).

SER. NO. 76-242,751, FILED 4-17-2001.

SOPHIA S. KIM, EXAMINING ATTORNEY

Int. Cl.: 3

Prior U.S. Cls.: 1, 4, 6, 50, 51, and 52

**United States Patent and Trademark Office**

Reg. No. 2,950,263
Registered May 10, 2005

## TRADEMARK
### PRINCIPAL REGISTER

## DAVIDOFF COOL WATER DEEP

ZINO DAVIDOFF SA (SWITZERLAND COR-
PORATION)
RUE FAUCIGNY 5
1700 FRIBOURG, SWITZERLAND

FOR: TOILETRIES, NAMELY, AFTER-SHAVE
LOTION, SKIN ENERGIZER, SKIN TONIC, SHOW-
ER GEL, SHAMPOO, BODY LOTION, PERSONAL
DEODORANTS AND ANTI-PERSPIRANTS, AND
BODY SOAP; PERFUMERY, EAU DE TOILETTE,
IN CLASS 3 (U.S. CLS. 1, 4, 6, 50, 51 AND 52).

FIRST USE 3-1-2004; IN COMMERCE 9-1-2004.

OWNER OF U.S. REG. NOS. 1,432,571, 2,024,983,
AND OTHERS.

SN 78-310,238, FILED 10-7-2003.

PAUL F. GAST, EXAMINING ATTORNEY

Int. Cl.: 3

Prior U.S. Cls.: 1, 4, 6, 50, 51 and 52

**United States Patent and Trademark Office**

Reg. No. 3,174,289
Registered Nov. 21, 2006

## TRADEMARK
### PRINCIPAL REGISTER

# SILVER SHADOW

ZINO DAVIDOFF SA (SWITZERLAND JOINT
   STOCK COMPANY)
RUE FAUCIGNY 5
CH-1700 FRIBOURG
SWITZERLAND

FOR: SOAPS FOR PERSONAL USE; PERFUM-
ERY; ESSENTIAL OILS; COSMETICS, EXCEPT
MAKE-UP PREPARATIONS; DENTIFRICES, IN
CLASS 3 (U.S. CLS. 1, 4, 6, 50, 51 AND 52).

THE MARK CONSISTS OF STANDARD CHAR-
ACTERS WITHOUT CLAIM TO ANY PARTICULAR
FONT, STYLE, SIZE, OR COLOR.

PRIORITY DATE OF 11-30-2004 IS CLAIMED.

OWNER OF INTERNATIONAL REGISTRATION
0853401 DATED 5-30-2005, EXPIRES 5-30-2015.

SER. NO. 79-012,109, FILED 5-30-2005.

SUSAN BILLHEIMER, EXAMINING ATTORNEY

Int. Cl.: 3

Prior U.S. Cls.: 1, 4, 6, 50, 51 and 52

**United States Patent and Trademark Office**

Reg. No. 3,184,046
Registered Dec. 12, 2006

## TRADEMARK
### PRINCIPAL REGISTER

# GAME

ZINO DAVIDOFF SA (SWITZERLAND JOINT STOCK COMPANY)
RUE FAUCIGNY 5
CH-1700 FRIBOURG
SWITZERLAND

FOR: PERFUMERY, EAU DE TOILETTE, PRE-SHAVE CREAMS, AFTER-SHAVE LOTIONS, SKIN TONERS, SHOWER GELS, PERSONAL SOAPS, BODY LOTIONS, HAIR SHAMPOO AND CONDITIONER, SUN BLOCK PREPARATIONS, SUN SCREEN PREPARATIONS, AFTER-SUN LOTIONS, TANNING CREAMS, PERSONAL DEODORANTS AND ANTI-PERSPIRANTS, IN CLASS 3 (U.S. CLS. 1, 4, 6, 50, 51 AND 52).

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

PRIORITY DATE OF 8-16-2005 IS CLAIMED.

OWNER OF INTERNATIONAL REGISTRATION 0866179 DATED 10-12-2005, EXPIRES 10-12-2015.

SER. NO. 79-016,815, FILED 10-12-2005.

MARY BOAGNI, EXAMINING ATTORNEY

Int. Cls.: 3, 14 and 18

Prior U.S. Cls.: 1, 2, 3, 4, 6, 22, 27, 28, 41, 50, 51 and 52

Reg. No. 3,242,675

## United States Patent and Trademark Office

Registered May 15, 2007

## TRADEMARK
### PRINCIPAL REGISTER

# SILVER SHADOW

ZINO DAVIDOFF SA (SWITZERLAND JOINT STOCK COMPANY)
RUE FAUCIGNY 5
CH-1700 FRIBOURG
SWITZERLAND

FOR: SOAPS, INCLUDING TOILET SOAPS; PERFUMERY, ESSENTIAL OILS, COSMETICS EXCEPT MAKE-UP PREPARATIONS; NON-MEDICATED TOILETRIES; SUN-CARE PRODUCTS FOR TANNING, NAMELY, LOTIONS AND CREAMS; BATH AND SHOWER FOAMS AND GELS; TONICS FOR BODY CARE; COSMETIC SKIN LOTIONS, TANNING CREAMS, BODY MOISTURIZING CONCENTRATES NOT FOR MEDICAL PURPOSES; AFTER-SHAVE OILS, CREAMS, POWDERS AND LOTIONS; SHAVING CREAMS, PRE-SHAVE CREAMS; EAU-DE-COLOGNE; TOILET WATER; DEODORANTS FOR PERSONAL USE BEING SPRAYS AND STICKS, ANTIPERSPIRANTS, IN CLASS 3 (U.S. CLS. 1, 4, 6, 50, 51 AND 52).

FOR: WATCHES, IN CLASS 14 (U.S. CLS. 2, 27, 28 AND 50).

FOR: LEATHER PURSES AND BRIEFCASES, IN CLASS 18 (U.S. CLS. 1, 2, 3, 22 AND 41).

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

PRIORITY DATE OF 8-9-2005 IS CLAIMED.

OWNER OF INTERNATIONAL REGISTRATION 0879527 DATED 12-27-2005, EXPIRES 12-27-2015.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "SILVER" IN INTERNATIONAL CLASS 14, APART FROM THE MARK AS SHOWN.

SER. NO. 79-021,839, FILED 12-27-2005.

MICHAEL KAZAZIAN, EXAMINING ATTORNEY

Int. Cls.: 3, 9, 11, 14, 16, 18, 25, 30 and 33

Prior U.S. Cls.: 1, 2, 3, 4, 5, 6, 13, 21, 22, 23, 26, 27, 28, 29, 31, 34, 36, 37, 38, 39, 41, 46, 47, 49, 50, 51 and 52

**Reg. No. 3,247,745**

## United States Patent and Trademark Office

Registered May 29, 2007

## TRADEMARK
### PRINCIPAL REGISTER

# DAVIDOFF

ZINO DAVIDOFF SA (SWITZERLAND JOINT STOCK COMPANY)
RUE FAUCIGNY 5
CH-1700 FRIBOURG
SWITZERLAND

FOR: SOAPS, INCLUDING TOILET SOAPS; PERFUMERY; ESSENTIAL OILS; COSMETICS; SUN-CARE PRODUCTS FOR TANNING, NAMELY, LOTIONS AND CREAMS; BATH AND SHOWER FOAMS AND GELS; TONICS FOR BODY CARE; COSMETIC SKIN LOTIONS; TANNING CREAMS; BODY MOISTURIZING CONCENTRATES NOT FOR MEDICAL PURPOSES; AFTER-SHAVE OILS, CREAMS, POWDERS AND LOTIONS; SHAVING CREAMS; PRE-SHAVE PRODUCTS, NAMELY, OILS, CREAMS, GELS AND LOTIONS; EAU-DE-COLOGNE; TOILET WATER; DEODORANTS FOR PERSONAL USE BEING SPRAYS AND STICKS, IN CLASS 3 (U.S. CLS. 1, 4, 6, 50, 51 AND 52).

FOR: SPECTACLES, THEIR PARTS AND ACCESSORIES, NAMELY SPECTACLE HOLDERS, AND UNMOUNTED SPECTACLE FRAMES; AUTOMATIC COFFEE AND COFFEE-CAPSULE VENDING MACHINES, IN CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND 38).

FOR: ELECTRIC COFFEE MAKERS; ELECTRIC COFFEE POTS, IN CLASS 11 (U.S. CLS. 13, 21, 23, 31 AND 34).

FOR: JEWELRY; WATCHES; WATCH MOVEMENTS AND THEIR PARTS; PENDANTS, IN CLASS 14 (U.S. CLS. 2, 27, 28 AND 50).

FOR: AGENDAS; PENCILS; PENS; FOUNTAIN PENS; PEN NIBS; DOCUMENT HOLDERS BEING PORTFOLIOS, IN CLASS 16 (U.S. CLS. 2, 5, 22, 23, 29, 37, 38 AND 50).

FOR: ATTACHÉ CASES; HANDBAGS; WALLETS; LEATHER PURSES; BRIEFCASES; KEY CASES; CREDIT CARD CASES, IN CLASS 18 (U.S. CLS. 1, 2, 3, 22 AND 41).

FOR: CLOTHING, NAMELY NECKTIES, SHIRTS, SUITS, PULLOVERS; BELTS MADE OF SKIN OR LEATHER, IN CLASS 25 (U.S. CLS. 22 AND 39).

FOR: COFFEE; SUGAR, IN CLASS 30 (U.S. CL. 46).

FOR: DISTILLED SPIRITS AND LIQUEURS, COGNAC, IN CLASS 33 (U.S. CLS. 47 AND 49).

PRIORITY DATE OF 7-8-2005 IS CLAIMED.

OWNER OF INTERNATIONAL REGISTRATION 0876874 DATED 11-7-2005, EXPIRES 11-7-2015.

SEC. 2(F).

SER. NO. 79-020,878, FILED 11-7-2005.

MICHAEL KAZAZIAN, EXAMINING ATTORNEY

# EXHIBIT D

**Main Identity**

| | |
|---|---|
| **From:** | "Joe Sollima" <jsollima@arcperfumes.com> |
| **To:** | <info@prestigefragrances.com> |
| **Sent:** | Thursday, June 15, 2006 5:24 PM |
| **Attach:** | Coolwater.gif; Coolwater1.gif |
| **Subject:** | Coolwater |

Manish-

For your review attached are the pics for the Coolwater. I need to have the warehouse check because we have both clean and decoded merchandise... so I will give you an exact count tomorrow for the clean goods.

I will keep the full qty of clean goods aside for you.

Regards,

Joe Sollima

American Resources Corp.
Ph:  (203) 378 - 3769
Fax: (203) 378 - 4137
jsollima@arcperfumes.com





# EXHIBIT E





3 414202 011769

Ce produit ne peut être vendu que par les dépositaires agréés



